**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| REINALDO FANTAUZZI | : CIVIL ACTION |
|---|---|
| | : |
| v. | : NO. 18-5166 |
| | : |
| OFFICER FERRACI, *et al.* | : |
| | : |

# MEMORANDUM

**KEARNEY, J.**                                                                          **November 29, 2019**

Reinaldo Fantauzzi suffered injuries when an unknown fellow inmate at SCI Graterford assaulted him on September 24, 2016 while housed in a high security housing unit with inmates with drug or gang relationships. He sued Pennsylvania Department of Corrections Secretary Wetzel, SCI Graterford Superintendent Link, Captain Terra, Lieutenant Reber, Chief Grievance Officer Varner, and Corrections Officer Ferraci, in their individual and official capacities for violating his civil rights.[1] We dismissed Mr. Fantauzzi's claims.[2] We granted him leave to plead claims arising from the September 24, 2016 assault against prison officials in their individual capacities. Mr. Fantauzzi now alleges Corrections Officer Ferraci violated his Eighth Amendment right to be free from cruel and unusual punishment when he failed to protect him by sleeping during his shift.[3] He alleges Superintendent Link and Lieutenant Reber failed to protect him by not replacing or adjusting surveillance cameras observing the guard office, and failing to train officers about the dangers of double shifts.[4] He also alleges Captain Terra retaliated against his exercise of his First Amendment rights when he kept Mr. Fantauzzi in the high security housing block for eleven months following Mr. Fantauzzi's grievances about his improper classification as a drug and gang affiliated inmate.[5]

Following study of his second amended complaint, we now dismiss his Eighth Amendment claims with prejudice but will allow him to proceed into discovery on his First Amendment retaliation claim against Captain Terra.

## I. *Pro se* alleged facts[6]

### *Captain Terra labels Mr. Fantauzzi "Gang and Drug Affiliated" and moves him to Upper I Block.*

In October 2015, Captain Terra labeled Mr. Fantauzzi "Gang and Drug Affiliated" and moved him to the "Upper I" Block in SCI Graterford.[7] The Upper I Block is a "high-security housing unit" for inmates with "drug and/or gang ties."[8] Mr. Fantauzzi disagreed with his "Gang and Drug Affiliated" label, and a prison investigation "cleared [Mr. Fantauzzi] of any association" with gang or drug activity.[9]

Mr. Fantauzzi spoke with Captain Terra "multiple times" about the violence and unsafe conditions of the Upper I Block, and Captain Terra became upset Mr. Fantauzzi questioned his label.[10] Captain Terra told Mr. Fantauzzi "[y]ou'll be gang-tied if I say you're gang-tied," "[m]aybe you should just let these boys initiate you, if you feel unsafe," and "[i]f you don't stop complaining, you'll never leave. I'll make sure you stay here forever."[11] Mr. Fantauzzi alleges Captain Terra left him in the Upper I Block "indefinitely" for "his audacity in questioning [Captain] Terra's decision to label him falsely."[12]

He plead during the eleven months Captain Terra confined him in the Upper I Block, gang-affiliated inmates singled him out.[13] These gang-affiliated inmates "felt compelled to target [Mr. Fantauzzi], as the only inmate who would not claim one gang or another."[14] Mr. Fantauzzi believes his "repeated attempts to reason with [Captain] Terra led to greater focus upon him by gangs."[15]

2

*The September 2016 assault on Mr. Fantauzzi in Upper I Block.*

Nearly a year after Captain Terra confined Mr. Fantauzzi in Upper I Block, a gang member attacked Mr. Fantauzzi on September 24, 2016.[16]  The assailant "tested the security on Upper I repeatedly" before attacking Mr. Fantauzzi.[17]  Corrections Officer Ferraci, assigned to the Upper I Block, slept in the Officer's Office as the attack occurred.[18]  The assailant approached the Officer's Post multiple times to ensure Officer Ferraci continued sleeping.[19]  The attack, "with a sharp edged weapon," caused Mr. Fantauzzi severe injuries requiring forty stitches.[20]  As a result of the attack, Mr. Fantauzzi has permanent facial nerve damage and a scar.[21]  Doctors diagnosed Mr. Fantauzzi with Post-Traumatic Stress Disorder.[22]

Mr. Fantauzzi alleges Corrections Officer Ferraci slept as part of his plot to "exploit DOC overtime polic[ies]."[23]  This napping violated Officer Ferraci's training and instruction "to never abdicate his responsibilities while on duty on Upper I" and orders "to never nap while on duty on Upper I or to leave his post for any amount of time without temporary substitute supervision."[24]  The corrections officers work eight-hour shifts.[25]  Officers who "pull a double" stay at SCI Graterford and work a second eight-hour shift right after finishing their first eight-hour shift.[26]  Corrections Officer Ferraci "familiarized himself with the [security camera] blindspots [*sic*] on Upper I to take extended sleep breaks . . . he was physically unable to take at home" because of the double shifts.[27]

Mr. Fantauzzi opines inmates "have raised the same argument for over ten years, that officers were sleeping on the job when assigned to office area posts."[28]  According to Mr. Fantauzzi, Lieutenant Reber and Captain Terra routinely allow corrections officers to sleep on duty, using the camera blind spots to hide their slumber.[29]  Both Lieutenant Reber and Captain Terra "have been aware of officers failing to remain awake on Upper I for years, but refused to

adjust the existing camera to cover well known and designed blindspot [*sic*], or to install another camera."[30] Mr. Fantauzzi made both Lieutenant Reber and Captain Terra aware Officer Ferraci slept "every shift he served on Upper I" and the jeopardy in which Officer Ferraci's naps put Mr. Fantauzzi.[31]

Mr. Fantauzzi also alleges Superintendent Link "chose not to provide sufficient cameras on Upper I despite her knowledge of sleeping officers, officer abuses of exorbitant overtime shifts, and a 'camera angle defense' that effectively dismissed all inmate claims of sleeping officers."[32] Superintendent Link also failed to train officers about the dangers of consistently serving double shifts.[33]

## II. Analysis

Superintendent Link, Captain Terra, Lieutenant Reber, and Corrections Officer Ferraci move to dismiss Mr. Fantauzzi's second amended complaint arguing: (1) Mr. Fantauzzi fails to plead personal involvement of Superintendent Link; (2) Mr. Fantauzzi fails to plead protected First Amendment activity for which Captain Terra retaliated; (3) Mr. Fantauzzi fails to plead Officer Ferraci's and Lieutenant Reber's deliberate indifference to a serious risk of harm; and (4) even if he does plead Officer Ferraci's and Lieutenant Reber's deliberate indifference, they are entitled to qualified immunity.[34]

### A. Mr. Fantauzzi fails to plead Superintendent Link's failure to supervise.

Mr. Fantauzzi alleges Superintendent Link "fail[ed] to train officers at Graterford about the myriad of risks associated with abusing multiple double shifts."[35] Mr. Fantauzzi lists the training Superintendent Link should have provide to Graterford officers.[36] He also alleges Superintendent Link failed to train Captain Terra to "remove inmates who were cleared of his initial label" from Upper I Block.[37] Superintendent Link failed to supervise corrections officers and failed to train

4

Captain Terra. Superintendent Link argues Mr. Fantauzzi insufficiently plead her involvement and fails to state a claim for supervisory liability. We agree with Superintendent Link.

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[38] "A civil rights complaint is adequate where it states the conduct, time, place, and persons responsible."[39] Under 42 U.S.C. § 1983, individual liability is only warranted where an individual personally directed or knowingly acquiesced to the alleged misconduct.[40]

A supervising public official has no "affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by . . . her subordinates."[41] Our Court of Appeals explains "while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct."[42]

Mr. Fantauzzi fails to plead Superintendent Link had "personal involvement in the alleged wrongdoing" leading to his assault. He plead Superintendent Link failed to train officers about the "myriad of risks associated with abusing multiple double shifts."[43] And he plead Superintendent Link failed to train Captain Terra to rehouse inmates cleared of a gang and drug affiliation label.[44] While Superintendent Link could not "authorize, encourage, or approve" the assault on Mr. Fantauzzi, her decisions on officer training allegedly contributing to the assault cannot serve as the basis for Mr. Fantauzzi's failure to supervise claim.

Our Court of Appeals also instructs "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that person . . . has exhibited deliberate

indifference to the plight of the person deprived."[45]    It explained to successfully assert a
supervisory liability claim:

> The plaintiff must (1) identify the specific supervisory practice or procedure . . .
> the     supervisor     failed     to     employ,     and     show     .     .     .     (2)
> the existing custom and practice without the identified, absent custom or procedure
> created an unreasonable risk of the ultimate injury, (3) the supervisor was aware . .
> . this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and
> (5) the underling's violation resulted from the supervisor's failure to employ that
> supervisory practice or procedure.[46]

Federal Rule of Civil Procedure 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of

entitlement to relief" rising "above the speculative level."[47]

Mr. Fantauzzi may satisfy the test by "(i) showing . . . the supervisor failed to adequately

respond to a pattern of past occurrences of injuries like the plaintiffs', or (ii) showing . . . the risk

of constitutionally cognizable harm was 'so great and so obvious . . . the risk and the failure of

supervisory officials to respond will alone' support finding . . . the . . . test is met."[48]  He must also

show "both contemporaneous knowledge of the offending incident or knowledge of a prior pattern

of similar incidents and circumstances under which the supervisor's actions or inaction could be

found to have communicated a message of approval to the offending subordinate."[49]

Mr. Fantauzzi fails to meet this burden.  First, he alleges Superintendent Link failed to

employ a specific supervisory practice of training officers about the dangers of double shifts.[50]  He

plead Superintendent Link "chose not to provide sufficient cameras on Upper I despite her

knowledge of sleeping officers, officer abuses of exorbitant overtime shifts, and a 'camera angle

defense' that effectively dismissed all inmate claims of sleeping officers."[51]  But he also plead

Officer Ferraci himself violated his training and orders not to nap.[52]  Because Mr. Fantauzzi plead

Officer Ferraci received training and orders not to nap while on duty, he undercuts his own

argument Superintendent Link needed to train officers about the dangers of double shifts.

6

Second, Mr. Fantauzzi alleges Superintendent Link failed to train Captain Terra to remove inmates from Upper I when they were cleared of drug and gang affiliation labels.[53]  But Mr. Fantauzzi again undercuts his own argument, pleading "[p]olicy at Graterford states . . . inmates found to not have gang ties must be moved off of the Upper I Unit for their own safety."[54]  The existing policy and custom at SCI Graterford, by Mr. Fantauzzi's own admission, is to remove inmates from Upper I when they are cleared of drug and gang affiliation.

Because both of Mr. Fantauzzi's failure to supervise claims are grounded in policies he admits SCI Graterford employs already, he cannot succeed.  Mr. Fantauzzi also fails to plead Superintendent Link's involvement in his assault.  His claims as to Superintendent Link relate only to the internal operations of SCI Graterford and its overtime policies and related training.  We dismiss his failure to supervise claims as to Superintendent Link.

### B. Mr. Fantauzzi plead a First Amendment claim against Captain Terra.

Mr. Fantauzzi sues Captain Terra for retaliating against Mr. Fantauzzi for exercising his First Amendment rights; specifically, he alleges Captain Terra retaliated against him for questioning Captain Terra's classification of Mr. Fantauzzi as gang and drug affiliated.[55]  Mr. Fantauzzi identifies two specific actions he took for which Captain Terra retaliated against him: (1) "[Mr. Fantauzzi] participated in the investigation into gang ties of himself playing a vital role in clearing his name of [Captain] Terra's false label;" and, (2) "[w]hen [Captain] Terra refused to release [Mr. Fantauzzi] from [Upper I Block], [Mr. Fantauzzi] filed grievances and wrote in-house correspondence complaining about [Captain] Terra's refusal.  [Captain] Terra deepened his refusal due to [Mr. Fantauzzi's] challenge of the label and subsequent success.  [Mr. Fantauzzi's] repeated complaints struck [Captain] Terra on a personal level, even though [Mr. Fantauzzi] mearly [*sic*] feared for his safety."[56]  Mr. Fantauzzi alleges Captain Terra's actions "chilled [Mr. Fantauzzi]

from exercising his right to file grievances, or otherwise challenge his underserved [*sic*] confinement amongst the most violent."[57]

Mr. Fantauzzi plausibly alleges Captain Terra retaliated against him for complaining of his alleged wrongful labeling when he entered SCI Graterford in October 2015. "A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him."[58] Causation can be shown through allegations of "(1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link."[59] Absent this proof, a plaintiff must show a fact finder should infer causation from the "evidence gleaned from the record as a whole."[60]

The plaintiff must show his engagement in protected conduct substantially motivated the retaliation.[61] "This 'motivation' factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred."[62] "The [state actors] must be aware of the protected conduct for it to be a substantial or motivating factor in a decision."[63] The plaintiff must prove retaliation motivated the defendants' conduct causing the harm.[64] While our Court of Appeals has allowed a *pro se* plaintiff to allege causation simply by including the word "retaliation" in the complaint,[65] "[b]ecause retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner."[66] At this preliminary stage, we must give credence to Mr. Fantauzzi's claim of a nexus between Captain Terra's alleged retaliatory conduct and the injuries suffered as a result of the assault.

### 1. Mr. Fantauzzi plead constitutionally protected conduct.

Captain Terra argues Mr. Fantauzzi plead no constitutionally protected conduct.[67] He argues "[t]o the extent [Mr. Fantauzzi] alleges . . . speaking 'face to face with [Captain] Terra' multiple times regarding being mis-housed in the Upper I Block constitutes constitutionally protected activity, this is patently insufficient."[68] If such speech constituted constitutionally protected activity, Captain Terra argues, "every prisoner in Pennsylvania would have a potential First Amendment retaliation claim for each and every oral complaint."[69]

Mr. Fantauzzi did more than just orally complain to Captain Terra. He participated in the internal investigation clearing him of the gang and drug affiliation label.[70] He also "filed grievances and wrote in-house correspondence complaining of [Captain] Terra's refusal" to release him from Upper I.[71] Courts accept as constitutionally protected conduct activities including prisoners filing formal grievance complaints against officers.[72] We conclude because Mr. Fantauzzi alleges he filed grievances against Captain Terra, he participated in constitutionally protected activity.

### 2. Mr. Fantauzzi plead Captain Terra's adverse action.

Mr. Fantauzzi must also plead the adverse action he suffered because of his constitutionally protected activity. He plead Captain Terra told him "[y]ou'll be gang-tied if I say you're gang-tied," "[m]aybe you should just let these boys initiate you, if you feel unsafe," and "[i]f you don't stop complaining, you'll never leave. I'll make sure you stay here forever."[73]

"It is well established . . . verbal harassment or threats . . . will not, without some reinforcing act accompanying them, state a constitutional claim."[74] Captain Terra's comments may be unprofessional, but, he argues, "they were clear exaggerations and hyperbole."[75] Mr. Fantauzzi pleads Captain Terra did not make empty threats. Mr. Fantauzzi plead he remained confined to

Upper I Block for eleven months despite an investigation clearing him of gang and drug affiliation.[76]

We agree with Mr. Fantauzzi, "[a]ny person of ordinary firmness would be chilled from continuing to complain" after being threatened with indefinite confinement in Upper I Block if he continued to grieve the treatment.[77] Discovery will assist in understanding the nexus.

### 3. Mr. Fantauzzi plead his grievances were a "substantial or motivating factor" for Captain Terra's adverse action.

Mr. Fantauzzi provides no discrete chronology for Captain Terra's conduct, but we may infer causation from the "evidence gleaned from the record as a whole."[78] Mr. Fantauzzi plead causation between his grievances and Captain Terra's threats and subsequent failure to move him from Upper I.[79] "[Captain] Terra made his retaliation crystal clear when he warned [Mr. Fantauzzi] . . . if he didn't stop seeking relief he would "never leave this block."[80] Mr. Fantauzzi plead these threats occurred after the investigation clearing him of gang and drug affiliation: "[Captain] Terra voiced outrage at [Mr. Fantauzzi] for having his decision [to label Mr. Fantauzzi gang and drug affiliated] questioned by [Mr. Fantauzzi], and the fact . . . an investigation found no merit in [Mr. Fantauzzi's] gang and drug label and no merit in [Captain] Terra's decision to house [Mr. Fantauzzi] in the most dangerous unit in Graterford."[81]

These facts allow us to conclude Mr. Fantauzzi's grievances were a "substantial or motivating factor" in Captain Terra's adverse action—continuing Mr. Fantauzzi's detention in Upper I. We find Mr. Fantauzzi successfully plead a claim for First Amendment retaliation against Captain Terra.[82]

### C. Mr. Fantauzzi fails to plead Officer Ferraci's deliberate indifference.

Mr. Fantauzzi sues Officer Ferraci for violating his Eight Amendment right "to be free from Cruel and Unusual Punishment by a failure to protect him in the face of normal prison

10

operations."[83] He alleges Officer Ferraci acted with deliberate indifference when he "chose to hide himself in a predetermined specific area of his office he knew he would fall into the well known blindspot [*sic*] on the video surveillance of the cameras on Upper I."[84] Mr. Fantauzzi claims the video footage he successfully recovered shows Officer Ferraci "missing during at least six consecutive [*sic*] security checks he should have been recorded taking."[85] He identifies four reasons Officer Ferraci knew "his slumber would jeopardize inmate safety": (1) "[t]he [Upper I Block] was designed to house the most violent inmates in [SCI] Graterford, those with verified gang and drug affiliations;" (2) "[Mr. Fantauzzi] was not affiliated with the [Upper I Block's] gangs, which singled him out as a target and convenient victim;" (3) "[o]fficers on the [Upper I Block] were required to perform security checks every 15 minutes without exception;" and, (4) "[a] sleeping officer undermines security of the [Upper I Block] and Graterford Prison as a whole."[86]

Officer Ferraci argues Mr. Fantauzzi alleges his deliberate indifference to "the interests or policies of the Department of Corrections rather than a substantial risk of harm" to Mr. Fantauzzi.[87] He argues Mr. Fantauzzi "fails to allege . . . Ferraci had actual knowledge of, and disregarded, a particular risk to [Mr. Fantauzzi] as of the time he chose to sleep on the job."[88] We agree with Correctional Officer Ferraci; Mr. Fantauzzi fails to meet the "deliberate indifference" standard under the Eighth Amendment.

The Constitution neither "mandates comfortable prisons" no "permit[s] inhumane ones."[89] The Eighth Amendment prohibits cruel and unusual punishment, imposing a duty on prison officials "to provide humane conditions of confinement."[90] This duty requires prison officials to "take reasonable measures to guarantee [inmate safety]" by protecting them from potential violence committed by other inmates.[91] Failure to protect claims involve an alleged deprivation

11

of an inmate's Eighth Amendment right focused on the particular basic need for personal safety.[92] "Still, not 'every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety.'"[93]

"An Eighth Amendment claim against a prison official must meet two requirements: (1) 'the deprivation alleged must be, objective, sufficiently serious;' and, (2) the 'prison official must have a sufficiently culpable state of mind.'"[94] Our Court of Appeals instructs:

> To state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts [showing] (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to [the] substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm.[95]

This "deliberate indifference" standard is a subjective one in the Eighth Amendment conduct, requiring "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[96] "It is well established [] merely negligent misconduct will not give rise to a claim under [section] 1983; the [Commonwealth] defendant must act with a higher degree of intent."[97] Judge Smith in *E.D. v. Sharkey* details the governing law in our Circuit confirming merely alleging "a defendant knew of a risk to the plaintiff is insufficient to support an inference of deliberate indifference absent any factual allegations supporting [the] conclusion, and thus cannot alone establish facial plausibility."[98]

Judge Smith dismissed the inmate's "failure to protect" allegations against the prison guard as the inmate's "conclusory statements [the prison official] noticed the attention [another inmate] directed toward her and knew about their intimate relationship are not entitled to a presumption of truth."[99] A fair comparison is found in *Bistrian v. Levi* where our Court of Appeals concluded the inmate plead a plausible failure to protect claim by alleging he advised prison officials of a specific violent threat made by an identified inmate and the officers still placed him "in the recreation yard with . . . [inmates] who knew of his prior complicity with prison authorities."[100]

Mr. Fantauzzi fails to allege Correctional Officer Ferraci personally knew of a particular risk for inmate assault against him in Upper I Block. He alleges Officer Ferraci slept at his post while the assault unfolded and missed safety checks every fifteen minutes but sleeping on the job is not deliberate indifference absent a more specific connection to the harm. Unlike in *Sharkey*, where the inmate at least made a conclusory statement about the prison official's knowledge, Mr. Fantauzzi plead no facts relating to Officer Ferraci's knowledge of his drug and gang affiliated label or any potential danger he faced. Mr. Fantauzzi concludes Officer Ferraci's deliberate indifference to his safety without pleading Officer Ferraci had any knowledge of him at all.[101] A correctional officer sleeping on the job may be negligent but, absent pleading Officer Ferraci knew of the risk from other inmates and ignored this risk by choosing to sleep rather than conduct safety checks every fifteen minutes, Mr. Fantauzzi cannot convert Officer Ferraci's alleged sleeping on the job into a constitutional deprivation of civil rights.

Unlike in *Bistrian* where the inmate told many prison officials he feared for his safety and prison officials knew he received specific threats from identified inmates,[102] Mr. Fantauzzi alleges Captain Terra labeled him "gang and drug affiliated" in October 2015, and Mr. Fantauzzi only complained about the label to Captain Terra.[103] Mr. Fantauzzi alleges he grieved the label and Captain Terra threatened him as a result, and alleges he told Captain Terra and Lieutenant Reber about Officer Ferraci's slumber.[104]

But he fails to allege he told Officer Ferraci about his concerns of remaining in Upper I. He did plead Officer Ferraci knew about the danger of Upper I, but not as specifically related to Mr. Fantauzzi himself.[105] He failed to explain how Officer Ferraci would personally know of the drug or gang affiliated label and/or any increased risk of potential violence to Mr. Fantauzzi by other inmates because of the label and continued confinement in Upper I. He fails to plead threats

13

of violence other inmates made against him putting Officer Ferraci on notice of an increased risk to officer safety.[106]

An inmate assaulted Mr. Fantauzzi on September 24, 2016, eleven months following Mr. Fantauzzi's incarceration in Upper I Block and his alleged conversation with Captain Terra about the improper drug or gang affiliation label.[107] Mr. Fantauzzi alleges no threats to his safety or conversations with other prison officials about this label concern within the eleven-month time gap, except for unspecified grievances Mr. Fantauzzi alleged he wrote.[108] Without alleging Correctional Officer Ferraci's personal knowledge of an objectively serious risk to Mr. Fantauzzi's safety, Mr. Fantauzzi plead mere negligence.[109]

Mr. Fantauzzi fails to plead Correctional Officer Ferraci's "deliberate indifference" to a serious risk of harm as the Eighth Amendment requires. His allegations against Correctional Officer Ferraci for his failure to protect Mr. Fantauzzi from another inmate's assault must be dismissed without prejudice.

### D. Mr. Fantauzzi fails to plead Lieutenant Reber's deliberate indifference.

Mr. Fantauzzi alleges Lieutenant Reber "failed to protect [Mr. Fantauzzi] by refusing to order and install new or additional cameras or simply adjust the camera to cover the known and routinely exploited blindspot [*sic*]."[110] He knew of the blind spots because other inmates complained about officers sleeping or not manning their posts.[111] He also "failed to demand officers under his supervision . . . conduct their mendated [*sic*] 15 minute security checks" allowing "officers [to] sleep for any extended period of time."[112]

Mr. Fantauzzi makes no allegation supporting his claim Lieutenant Reber violated his Eighth Amendment rights. "An Eighth Amendment claim against a prison official must meet two requirements: (1) 'the deprivation alleged must be, objectively, sufficiently serious;' and, (2) the

14

'prison official must have a sufficiently culpable state of mind.'"[113] The Eighth Amendment's "deliberate indifference" standard is a subjective one, requiring "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[114]

Mr. Fantauzzi plead no facts linking Lieutenant Reber to his assault. Mr. Fantauzzi only alleges he "refus[ed] to order and install new or additional cameras or simply adjust the camera to cover the known and routinely exploited blindspot [*sic*]."[115] This "allow[ed] officers the ability to catch up on necessary sleep in order to continue to exploit the overtime position availability."[116]

Because Mr. Fantauzzi does not allege Lieutenant Reber's involvement in his assault— never mind specifically alleging his deliberate indifference to a substantial risk to his safety relating to his assault—he cannot maintain an Eighth Amendment claim against Lieutenant Reber for "deliberate indifference to [Mr. Fantauzzi's] safety."[117] Mr. Fantauzzi fails to plead Lieutenant Reber's "deliberate indifference" to a serious risk of harm as the Eighth Amendment requires.

## III. Conclusion

We grant Corrections Officer Ferraci's, Lieutenant Reber's, and Superintendent Link's motions to dismiss. We deny Captain Terra's motion to dismiss Mr. Fantauzzi's First Amendment retaliation claim.

---

[1] *Fantauzzi v. Wetzel*, No. 18-5166, 2019 WL 4543095, at *2 (E.D. Pa. Sept. 18, 2019).

[2] *Id.*

[3] *Id.* at ¶ 55.

[4] *Id.* at ¶¶ 57-58.

[5] *Id.* at ¶ 56.

[6] "Despite *Iqbal*'s heightened pleading requirements, the district court must be more flexible in its interpretation of *pro se* pleadings." *Boyer v. Mohring*, 994 F. Supp. 2d 649, 654 (E.D. Pa. 2014); *see Higgs v. Attorney General of the United States*, 655 F. 3d 333, 339 (3d Cir. 2011), *as amended*

(Sept. 19, 2011) ("[W]hen presented with a *pro se* litigant, we 'have a special obligation to construe his complaint liberally.'" (quoting *United States v. Miller*, 197 F.3d 644, 648 (3d Cir. 1999))).

[7] *Id.* at ¶ 10.

[8] *Id.*

[9] *Id.* at ¶¶ 11-12.

[10] *Id.* at ¶¶ 13-14.

[11] *Id.* at ¶ 15.

[12] *Id.* at ¶ 19.

[13] *Id.* at ¶ 20.

[14] *Id.*

[15] *Id.* at ¶ 22.

[16] *Id.* at ¶ 28.

[17] *Id.* at ¶ 31.

[18] *Id.* at ¶ 33.

[19] *Id.* at ¶ 31.

[20] *Id.* at ¶ 28.

[21] *Id.* at ¶ 29.

[22] *Id.* at ¶ 30.

[23] *Id.* at ¶ 33.

[24] *Id.* at ¶ 27.

[25] *Id.* at ¶ 35.

[26] *Id.*

[27] *Id.* at ¶ 39.

[28] *Id.* at ¶ 41.

[29] *Id.* at ¶ 43.

[30] *Id.* at ¶ 44.

[31] *Id.* at ¶ 45.

[32] *Id.* at ¶ 48.

[33] *Id.* at ¶ 50.

[34] ECF Doc. No. 35. When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as reasonable inferences . . . can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief . . . is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content . . . allows the court to draw the reasonable inference . . . the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations . . ., 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[W]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[35] *Id.* at ¶ 58.

[36] *Id.* at ¶ 58 (A)-(C) ("(A) Sleep deprivation will compound upon an individual who double shifts repetitively, leaving them mentally fatigued and unable to hold off sleep while on duty; (B) [m]ental fatigue will lead to inattentiveness, lack of acuity, lack of necessary security skills of Corrections Officers, like recognizing out of place behaviors by inmates, conflicts, decision making, etc.; [and,] (C) [d]iscipline of officers who fail to make security rounds and investigation into why any officer would miss 90 minutes of continued security checks[.]").

[37] *Id.* at ¶ 58.

[38] *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

[39] *Id.*

[40] *Id.*; *see, e.g.*, *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990) (affirming dismissal of prison superintendent for plaintiff's failure to state a claim because nothing in the record suggested the superintendent's involvement in the alleged acts or his knowledge or acquiescence of those acts).

[41] *Chinchello*, 805 F.2d at 133 (citing *Rizzo*, 423 U.S. 362 (1976)).

[42] *Id.* (citing *Black v. Stephens*, 662 F.2d 181 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).

[43] ECF Doc. No. 32 at ¶ 58.

[44] *Id.*

[45] *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

[46] *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *Sample*, 885 F.2d at 1118).

[47] *McTernan v. City of York, PA*, 564 F.3d 636, 657 (3d Cir. 2009) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

[48] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136-37 (3d Cir. 2001) (quoting *Sample*, 885 F.2d at 1118).

[49] *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997)).

[50] ECF Doc. No. 32 at ¶ 58.

[51] *Id.* at ¶ 48.

[52] *Id.* at ¶ 27.

[53] *Id.* at ¶ 58.

[54] *Id.* at ¶ 18.

[55] *Id.* at ¶ 56.

[56] *Id.* at ¶ 56 (A)-(B).

[57] *Id.* at ¶ 56.

[58] *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (citing *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

[59] *DeFranco v. Wolfe*, 387 F. App'x 147, 154 (3d Cir. 2010).

[60] *Beyer v. Borough*, 428 F. App'x 149, 155 (3d Cir. 2011) (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[61] *Id.* at 154; *see also Rauser*, 241 F.3d at 333 (Our Court of Appeals adopts the framework for First Amendment retaliation in the employment context for the same claim in the prisoner context).

[62] *Miskovitch v. Hostoffer*, 721 F. Supp. 2d 389, 397 (W.D. Pa. 2010) (internal citations omitted).

[63] *Beyer*, 428 F. App'x at 155 (citing *Gorum v. Sessons*, 561 F.3d 179, 188 (3d Cir. 2009)).

[64] *Miskovitch*, 721 F. Supp. 2d at 397 (citing *Hannon v. Speck*, No. 87-3210, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988)).

[65] *Mitchell*, 318 F.3d at 530.

[66] *Miskovitch*, 721 F. Supp. 2d at 396 (internal citations omitted).

[67] ECF Doc. No. 35 at p. 7-8.

[68] *Id.*

[69] *Id.* at p. 8.

[70] ECF Doc. No. 32 at ¶ 56(A)

[71] *Id.* at ¶ 56(B).

[72] *Mitchell*, 318 F.3d at 530.

[73] ECF Doc. No. 32 at ¶ 15.

[74] *Maclean v. Secor*, 876 F. Supp. 695, 698 (E.D. Pa. 1995) (*citing Murray v. Woodburn*, 809 F. Supp. 383, 384 (E.D. Pa. 1993); *Prisoners' Legal Association v. Roberson*, 822 F. Supp. 185, 189 (D.N.J. 1993); *Collins v. Cundy*, 603 F.2d 825, 826 (10th Cir. 1979); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)).

[75] ECF Doc. No. 35 at p. 10.

[76] ECF Doc. No. 32 at ¶¶ 19-20.

[77] *Id.* at ¶ 56.

[78] *Beyer*, 428 F. App'x at 155.

[79] ECF Doc. No. 32 at ¶ 56

[80] *Id.*

[81] *Id.* at ¶ 14.

[82] Mr. Fantauzzi alleges retaliation, and the mere use of the word "retaliation" may be sufficient to meet the third prong of a First Amendment retaliation claim. *See, e.g.*, *Morales v. Berks County Prison*, No. 10-5117, 2011 WL 2746077, at *5 (E.D. Pa. July 14, 2011) ("Plaintiff's use of the word 'retaliation' in his complaint sufficiently implies a causal connection between his grievances and the allegedly adverse action taken against him.") (citing *Mitchell*, 318 F.3d at 530).

[83] *Id.* at ¶ 55.

[84] *Id.*

[85] *Id.* (emphasis in original).

[86] *Id.* at ¶ 55 (A)-(D).

[87] ECF Doc. No. 35 at p. 9.

[88] *Id.* at p. 10.

[89] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations omitted).

[90] *Id.*

[91] *Id.* at 832-33 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

[92] *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (confirming even an unsentenced inmate "had a clearly established constitutional right to have prison officials protect him from inmate violence.").

[93] *See id.* (quoting *Farmer*, 511 U.S. at 834).

[94] *Wilson v. Ellett*, No. 15-283, 2016 WL 613824, at *2 (M.D. Pa. Feb. 16, 2016) (quoting *Farmer*, 511 U.S. at 834).

[95] *Bistrian*, 696 F.3d at 367 (quoting *Farmer*, 511 U.S. at 834).

[96] *Beers-Capitol*, 256 F.3d at 125; *see also Bistrian*, 696 F.3d at 367 ("It is not sufficient [] the official should have known of the risk. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety [through circumstantial evidence].") (internal citations omitted).

[97] *Burton v. Kindle*, 401 F. App'x 635, 637-38 (3d Cir. 2010) ("In assessing where on the state-of-mind continuum misconduct must fall to establish a [section] 1983 claim, we have settled on 'deliberate indifference' [] in cases involving prisoners . . . .").

[98] *E.D. v. Sharkey*, No. 16-2750, 2017 WL 2126322, at *6-7 (E.D. Pa. May 16, 2017).

[99] *Id.* at *7.

[100] *Bistrian*, 696 F.3d at 368-71.

[101] ECF Doc. No. 32 at ¶ 55.

[102] *Bistrian*, 696 F.3d at 368-71.

[103] ECF Doc. No. 32 at ¶¶ 10-15.

[104] *Id.* at ¶¶ 45, 56.

[105] *Id.* at ¶¶ 53, 55.

[106] *See Hodges v. Wilson*, 341 F. App'x 846, 849 (3d Cir. 2009) ("The single, two year-old incident with his cell mate [plaintiff] asserts does not establish [] prison officials 'kn[e]w of and disregard[ed] an excessive risk to [his] health or safety.").

[107] ECF Doc. No. 32 at ¶ 28.

[108] *Id.* at ¶ 56(B).

[109] *Burton*, 401 F. App'x at 637-38 (finding inmate plaintiff failed to allege the prison official behaved with deliberate indifference because his complaint did not set forth any facts suggesting the official personally knew another inmate would attack him) (noting mere negligent conduct is not actionable under section 1983); *see County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

[110] *Id.* at ¶ 57.

[111] *Id.*

[112] *Id.*

[113] *Wilson*, 2016 WL 613824, at *2.

[114] *Beers-Capitol*, 256 F.3d at 125; *see also Bistrian*, 696 F.3d at 367 ("It is not sufficient [] the official should have known of the risk. A plaintiff can, however, prove an official's actual

knowledge of a substantial risk to his safety [through circumstantial evidence].") (internal citations omitted).

[115] ECF Doc. No. 32 at ¶ 57.

[116] *Id.*

[117] *Id.*